Ronald TUNE, Respondent,

v.

SYNERGY GAS CORPORATION, Appellant.

No. 76294.

Supreme Court of Missouri, En Banc.

Aug. 15, 1994.

As Modified on Denial of Rehearing Sept. 20, 1994.

**12**

## I.

Granby Gas set up a system for the retail sale of propane at 71 Truck Stop. Granby Gas retained ownership of the equipment it installed with the exception of the 1000 gallon storage tank. Defendant Synergy purchased Granby Gas Company and acquired its equipment on May 12, 1988. On May 25, 1988, Synergy sold and delivered approximately 300 gallons of propane to 71 Truck Stop. After the delivery, there were approximately 840 gallons in the tank.

Plaintiff Ronald Tune was employed by Tim Heifner in Heifner's business, Satellites Unlimited, which sells and services satellite television equipment. On June 24, 1988, Heifner and Tune had a job updating an existing satellite system. The job entailed cutting and welding angle iron. That morning, Tune was preparing the equipment for the job. He opened the valve to the propane cylinder for the cutting torch, smelled nothing, and assumed the tank was empty. Tune then loaded the welder and the propane and oxygen cylinders for the torch into a trailer. Heifner and Tune proceeded to the 71 Truck Stop to have the propane cylinder filled.

A portable propane cylinder should only be filled to eighty percent of capacity. The only way to determine how much propane is in a cylinder of the type Heifner and Tune had is to weigh it. However, the attendant at 71 Truck Stop did not weigh the cylinder. The attendant filled the cylinder until the pump motor "bogged out" or "couldn't run anymore" and said he was giving Heifner and Tune a good deal. As a result, the cylinder was overfilled to nearly one hundred percent capacity.

Heifner and Tune then drove the forty-five to fifty miles to their job site and arrived at approximately 11:00 a.m. They began upgrading the system and were working approximately twenty feet downwind from their trailer where the propane tank was located. Heifner first made some cuts with the propane torch and then began welding. When Heifner struck the third welding rod, there was an explosion. The two were surrounded by flames.

Tune suffered partial thickness burns to approximately forty percent of his body. He

Thomas R. Larson, David E. Larson, Melody L. Nashan, Kansas City, Bruce Taylor, Brian T. Taylor, Neosho, for appellant.

Robert W. Evenson, Pineville, for respondent.

THOMAS, Judge.

Ronald Tune brought this action against Synergy Gas Corporation (Synergy) for severe burns and other personal injuries he sustained in a propane gas explosion and fire. The jury assessed one hundred percent fault to Synergy and found damages to be $2,850,-000.00. The damage figure was adjusted for settlement amounts and prejudgment interest, and the trial court entered a judgment of $2,812,556.84 in favor of Tune. Synergy appealed and the court of appeals affirmed. Synergy then sought transfer to this Court. We affirm in part and reverse and remand in part.

received treatments for approximately forty days including twenty-six days of hospitalization. His treatments included hydrotherapy for which he was placed in a saltwater and antiseptic solution twice a day for cleaning of his burns. This procedure includes debridement during which dead tissue is scrubbed off with a brush. He was required to wear a body suit for one year following his hospitalization.

Tune's injuries are permanent. He has to use special soaps and lotions. Noises scare him; his nerves are "pretty shot;" he has trouble sleeping; he is sensitive to the sun, heat, cold, detergents, and other substances; his skin changes colors and tears easily; he has severe reactions to insect bites and stings; he has scarring; and he has a feeling of tightness in his skin. His ability to work and to engage in recreational activities has been restricted.

The pleadings alleged alternative theories of strict liability and negligence. The negligence allegations included negligent overfilling of the cylinder and negligent failure to train. The strict liability counts included defective and unreasonably dangerous product and failure to warn. The case was ultimately submitted only on strict liability-failure to warn.

Expert testimony established that the overfilling of the cylinder combined with the expansion of the gas with the heat of the day caused propane to leak out of the cylinder. The propane, being heavier than air, settled near the ground and was carried toward the men by a slight breeze. The propane was ignited by the arc from the welder.

Propane is an odorless gas. An odorant, usually ethyl mercaptan, is added to propane to warn of the presence of propane gas. The effectiveness of ethyl mercaptan can decrease through several factors including oxidation with rust on the inside of a cylinder and adsorption on various surfaces such as the ground. Also, because propane is heavier than air, propane may be at a greater concentration at ground level before there is a sufficient concentration to detect the odorant at the level of a person's nose.

Heifner and Tune each testified that they did not smell the propane odorant before the explosion. Tune testified that he knew what propane smelled like but that he did not know its chemical properties. There was expert testimony that the circumstances surrounding the explosion and fire were consistent with there having been a significant decrease in odorant concentration in the gas. Synergy provided no warning of the risk that ethyl mercaptan might not be effective to provide warning of the presence of gas and provided no training to the employees of 71 Truck Stop before the accident.

## II.

We first address Synergy's point that the trial court should have directed a verdict in favor of Synergy because Tune failed to make a submissible case on product liability-failure to warn. Synergy contends that the product did not reach Tune without a substantial change in condition, there was no expert testimony that the product was defective or unreasonably dangerous, and Tune failed to show causation because the evidence fails to establish that a warning would have prevented the accident.

An appellate court views the evidence in the light most favorable to the plaintiff to determine whether a submissible case was made when reviewing the denial of a motion for a directed verdict. *Winn–Senter Const. v. Katie Franks, Inc.*, 816 S.W.2d 943, 944 (Mo.App.1991). The elements of a cause of action for strict liability-failure to warn are: (1) defendant sold the product in question in the course of defendant's business; (2) the product was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics; (3) the defendant did not give adequate warning of the danger; (4) the product was used in a reasonably anticipated manner; and (5) plaintiff was damaged as a direct result of the product being sold without an adequate warning. *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 382 (Mo. banc 1986); MAI 25.05 (4th ed. 1991).

## A.

■ Synergy argues that the propane gas was substantially changed from the condition in which it was sold when the cylinder was overfilled at the truck stop and that Synergy should therefore be relieved of liability. Tune put on evidence that Synergy failed to warn of the dangers of overfilling or of the possibility that the odor in ethyl mercaptan might be ineffective to warn of the presence of propane. The reason for not overfilling, the danger of expansion and leakage rather than giving the customer more propane than the customer bought, was one of the things Tune argued that Synergy should have explained. There was no evidence that overfilling the cylinder changed the characteristics of the gas or the odorant. These characteristics were present when the propane was sold by Synergy. There was no evidence that the overfilling in any way affected the likelihood that ethyl mercaptan might not be effective to warn of the presence of propane. The dangerous product, the propane gas, was not modified.

## B.

■ Synergy concedes that under current Missouri law expert testimony is not necessarily required to establish product defect or unreasonable danger. *See Nesselrode,* 707 S.W.2d at 378; *Wadlow by Wadlow v. Lindner Homes, Inc.,* 722 S.W.2d 621, 625 (Mo.App.1986). Synergy urges this Court to adopt a rule requiring expert testimony to establish product defect or unreasonable danger in every design defect or failure to warn case.

In this case there was expert testimony that the effectiveness of ethyl mercaptan can decrease, that Synergy gave no warning of this characteristic, that propane is very dangerous without knowledge of this characteristic, and that the circumstances were consistent with there having been a significant decrease in odorant concentration. The jury had guidance and was not left to speculation and conjecture.

Given this information, a reasonable jury would have no problem in determining that propane gas is unreasonably dangerous and should be able to make this determination, particularly where there was no warning at all. A jury would have little trouble discerning that no warning was not an adequate warning. We decline to adopt the overly-inclusive rule proposed by Synergy in this case.

## C.

■ There are two separate requirements of causation in a failure to warn case: (1) the product for which there was no warning must have caused plaintiff's injuries, and (2) the plaintiff must show that a warning would have altered the behavior of those involved in the accident. *Arnold v. Ingersoll–Rand Co.,* 834 S.W.2d 192, 194 (Mo. banc 1992). Synergy argues that Tune did not show the second requirement.

■ If there is sufficient evidence from which a jury could find that the plaintiff did not already know the danger, there is a presumption that a warning will be heeded. *See id.* Tune testified that he knew what propane smelled like but that he did not know its chemical properties. He stated that he assumed the cylinder was empty the morning of the accident because he smelled nothing when he opened the valve. From this testimony, the jury could find that Tune did not know of the danger that the odorant might not be effective to indicate the presence of propane under some circumstances. This question gives rise to the presumption that a warning would have been heeded. In this instance, the term "presumption" is used to mean "makes a prima facie case," i.e., creates a submissible case that the warning would have been heeded. Synergy's claim to the contrary is without merit.

## D.

Looking at the facts in the light most favorable to the plaintiff, we find that Tune made a submissible case in strict liability failure to warn. This point is denied.

## III.

■ Appellant, Synergy Gas, next complains that the trial court erred in admitting evidence that it did not conduct any training sessions at 71 Truck Stop until eighteen

months after the accident. Synergy argues that such evidence is highly prejudicial and is not relevant because it merely proves carelessness or negligence by Synergy following the accident and that post-accident conduct was not causal of the plaintiff's injuries. Synergy cites several locations in the transcript where it claims such evidence was admitted, but the only evidence that remotely resembles the evidence complained of in this point of error in Synergy's brief to which there was any objection is one question and answer in the deposition of Joseph Waddell. Waddell became a branch manager of the Synergy facility at Granby in December 1988, approximately six months after the plaintiff was injured. The question and answer, and two follow-up questions and answers, read to the jury, were as follows:

> Q: Now, since you didn't become the Branch Manager until December of '88, did you—when did you go over it [conduct a safety training session] with these people?
>
> A: I'm not sure exactly. I believe I held a safety meeting there probably in December of '89, or something like that.
>
> Q: Okay, it wasn't prior to June 24, 1988?
>
> A: No.
>
> Q: Do you know of any other representative of Synergy Gas who may have given them a safety course or safety instructions with regard to the handling of LP gases prior to June 24, 1988?
>
> A: Not to my knowledge.

Defendant made timely objection to the reading of the first question on the grounds that anything that occurred after the date of the accident is not relevant. Plaintiff's counsel argued that he was not trying to show the nature of the training that occurred but was attempting to show that the first training Synergy did at the truck stop after they purchased the business was in December 1989, approximately eighteen months after the accident. The trial court admitted the evidence stating: "It appears to me that this is relevant in that it tends to show that there was no training given to the C.A.M. people before the accident. It is relevant in that respect, so I overrule the objection."

▮ An item that is relevant for one purpose but not for another is nevertheless admissible. *McCormick on Evidence*, § 59 (4th ed. 1992). In the context of this question and answer, the reference to training in December 1989 is simply the witness' method of communicating the idea that there was no training before, at or near the time of the accident because it was, in fact, eighteen months later when the first training occurred. The thrust of the evidence is further emphasized by the two follow-up questions, both of which refer to and emphasize the date of the accident, June 24, 1988. If defendant wished to further emphasize the limited purpose of this evidence, it was free to request an instruction limiting the jury's use of this evidence. *See id.* No such request was made. The trial court was clearly within its discretion in admitting this evidence for the limited purpose for which it was admitted.

▮ Synergy also complains that plaintiff improperly argued this evidence in closing argument by asking the jury to use it as evidence of negligence in the eighteen months following the accident rather than for the limited purpose for which it was admitted. It is true that plaintiff's counsel was running a substantial risk of error when he argued: "Nobody [from Synergy Gas] concerned with safety or about safety went to that truck stop for 18 months after they took over." However, there was no objection of any type to this argument, no motion for a mistrial and no motion to strike, so nothing is preserved for appeal. It is particularly important in closing argument that objections be preserved so that the trial court will have an opportunity to correct this type of error without causing a mistrial. It would have been relatively simple and entirely understandable for the trial court to explain to the jurors that the failure to instruct the truck stop personnel in safety during the eighteen months following the accident had nothing to do with this accident and that they should not consider this contention in arriving at their verdict. The important point is that the failure of the defendant to object and preserve this potential error is fatal to this point on appeal.

The court of appeals analyzed, and the parties briefed, the admissibility of this evidence on the theory of subsequent remedial measures. The issue of the admissibility of evidence of remedial measures is presented when a plaintiff offers evidence of some precaution or preventive measure taken by a defendant after an accident for the purpose of the jury comparing the remedial measure with the absence thereof at the time of the accident and concluding that the defendant was at fault for failing to take the remedial measures prior to the accident. To raise such an issue in this case would require detailed evidence that the training sessions were at least in part devoted to subjects related to the cause of this accident. We pointed out above that the mention of safety training sessions in this evidence was merely to denote the end of the period of time before and after the accident when no training sessions occurred. The evidence does not begin to disclose the kind of information that would be necessary for the jury to evaluate whether the type of training that occurred beginning in December 1989 would have been of any usefulness in avoiding the accident had the training occurred prior to June 1988. More importantly, the court did not admit the evidence for this purpose. As pointed out above, this evidence was admitted for a very limited purpose. Even considering plaintiff's argument, to which no objection was made, this evidence was not offered or used as evidence of remedial measures. We decline to evaluate it on that basis. This point is denied.

## IV.

### A.

We next consider Synergy's point of error concerning plaintiff's closing argument on damages. Synergy claims the trial court was in error in overruling defendant's objection and allowing plaintiff's counsel to argue a specific amount of total damages for the first time in the final portion of plaintiff's closing argument.

Plaintiff's counsel devoted most of the initial portion of his closing argument to liability issues. Then, at the end of this argument, he talked about the damages the plaintiff had sustained. He summarized the amounts of the actual out-of-pocket past expenses, primarily medical and loss of wages, which he explained to the jury totaled $54,419.28. Plaintiff's counsel then told the jurors that they would have to put down a figure for pain and suffering and for diminishment of quality of life; that the jury had evidence that plaintiff had a life expectancy of 35 years and that he will have future medical expenses, future loss of earnings, future pain and suffering and future loss of quality of life, all for the next 35 years. He closed this portion of his argument by telling the jurors that they would have to total that all up to arrive at the amount to award the plaintiff, but he made no suggestion or request for a specific amount of total damages.

Defendant's closing argument was devoted totally to issues of liability. The closest reference defendant's counsel made to damages was that "Mr. Tune received bad injuries" and that he (defendant's counsel) did "not want to downplay" the injuries.

Plaintiff's counsel then returned for his final closing argument and, after a few miscellaneous comments concerning liability, said: "Let's talk about damages." He proceeded to suggest specific amounts for various damages, including $2,000,000.00 for past pain and suffering, $40,000.00 for past diminishment of quality of life, $6,006.00 for lip balm for the rest of his life, and $248,400.00 for loss of future earnings. He then discussed future pain and suffering, for which he asked $1,040,000.00, and $20,000.00 for future loss of quality of life. He asked for a total verdict of $3,368,825.29. When it became clear he was going to ask for specific amounts of money, but before he mentioned any particular amount, defendant made the following objection:

[DEFENDANT'S ATTORNEY:] Objection. Your Honor, may we approach the bench?

(Counsel approached the bench and the following proceedings were had out of the hearing of the jury:)

[DEFENDANT'S ATTORNEY:] Your Honor, I think it's improper for him to

mention an amount, since he didn't mention it in the first part of his argument.

[PLAINTIFF'S ATTORNEY:] I talked about damages.

[DEFENDANT'S ATTORNEY:] You did not mention an amount.

[PLAINTIFF'S ATTORNEY:] Sure, I did. I talked about filling in the amounts.

[DEFENDANT'S ATTORNEY:] He did not mention an amount. And he can't—

[PLAINTIFF'S ATTORNEY:] Certainly I can.

[THE COURT:] Objection's overruled; go ahead.

■ The party with the burden of proof (usually the plaintiff) splits the time allowed for closing argument and argues first and last; the other party (usually the defendant) argues in the middle. The plaintiff's final closing argument, often called rebuttal,[1] is normally limited to a rebuttal argument. *Votrain v. Illinois Terminal R. Co.,* 268 S.W.2d 838, 844 (Mo. banc 1954). This means, at a minimum, that the plaintiff's counsel can answer and cover whatever subject matters were covered by defense counsel in closing argument. However, as the rules have developed in Missouri, plaintiff's counsel is not limited merely to rebutting the argument that defense counsel made but, in addition, may cover any subject that the plaintiff covered in the initial portion of the closing argument, even if the defendant did not argue this subject. This expansion of the true rebuttal rule is supported by the rationale that the reason for limiting plaintiff's counsel to rebuttal in the final portion of the closing argument is to afford defendant an opportunity to answer any argument the plaintiff makes. If the argument in issue is covered by the plaintiff in the initial part of the closing argument, then the defendant had an opportunity to answer the argument, and that meets the requirements of the rule.

This approach (determining what is proper rebuttal by what the plaintiff argues in the initial part of the closing argument) developed from *Shaw v. Terminal Railroad Ass'n of St. Louis,* 344 S.W.2d 32 (Mo.1961). In *Shaw,* plaintiff's counsel argued liability only and then closed the initial portion of his closing argument by telling the jury that he would have some additional matters to discuss when he came back. In response to this, defendant's counsel approached the bench and advised the court and plaintiff's counsel that if plaintiff's counsel intended to cover new matters not previously covered, and particularly damages, he should cover them in his initial argument so that defense counsel would have an opportunity to answer. Defense counsel served notice he intended to object to any new points in plaintiff's final argument. The court overruled the objection. Plaintiff's counsel made no further argument at this time, and defense counsel then made his argument but did not argue damages. Plaintiff's counsel returned and, over objection, made an extensive damage argument, which he concluded by asking for a verdict of $25,000.00. *Id.* at 36. This Court held that the party having the burden of proof may not, after full notice and warning, withhold all argument on damages in the initial portion of the closing argument and then make such an argument and request a specific amount of money in the final portion of the closing argument.[2] In reversing and remanding for a new trial, we said that counsel for plaintiff will be required to state the essential points in the initial closing argument, at least to the extent that the defendant may fairly answer them. *Id.* at 37.

1. Some of the confusion in this area is attributable to the terminology. In this opinion we have referred to counsel's argument following the evidence as "closing argument" as contrasted with the "opening statement," which occurs before the evidence is heard. Plaintiff's opening and closing portion of the closing argument are referred to as "plaintiff's·initial closing argument" and "plaintiff's final closing argument." Defendant's argument, which is usually not split, is referred to as "defendant's closing argument." Although some courts refer to the final closing argument of plaintiff as "rebuttal argument," we have reserved the term "rebuttal" to describe the process of responding directly to the opponent's argument by denial, explanation or other similar response.

2. We do not understand the holding of Shaw to include the requirement that a notice and warning are necessary. Accord *Misch v. C.B. Contracting Co.,* 394 S.W.2d 98, 103 (Mo.App.1965).

*Shaw* has been cited so extensively for the proposition that the plaintiff cannot withhold all argument on damages in the initial portion of the closing argument and then argue damages in the final portion of the argument that the Missouri rule as to what is proper rebuttal is commonly inaccurately stated by referring only to what the plaintiff argued in the initial portion of the closing argument. On the few occasions when the Missouri courts have faced the issue of what is proper rebuttal under circumstances in which defendant has argued damages in defendant's closing argument, the courts have referred to this circumstance as a waiver of the general rule that looks to plaintiff's initial closing argument to determine what is proper rebuttal. *See Barrett v. Morris*, 495 S.W.2d 100, 105 (Mo.App.1973); *Weinbauer v. Berberich*, 610 S.W.2d 674, 678 (Mo.App.1980). It is more accurate and helpful to state the complete rule in the affirmative, i.e., in the final portion of the closing argument a plaintiff can argue anything that plaintiff argued in the initial portion of the closing argument [3] and rebut anything that the defendant argued in defendant's portion of the closing argument.[4]

Applying this rule to the present case, although the defendant did not argue damages in his portion of the closing argument, the plaintiff did make a limited damage argument as a part of his initial portion of the closing argument. Thus, it becomes necessary to examine the damage arguments by plaintiff to determine whether the argument plaintiff's counsel made in the final portion of his closing argument was closely enough related to the damage argument made in the initial portion of his closing argument that it constituted proper argument.

Of course, it is obvious that in applying the foregoing rule to the specific facts of any case, there is an infinite spectrum of issues as to what constitutes the same subject that was previously argued or what constitutes a new and therefore improper argument. The Missouri courts, as well as most other courts, have recognized that the practical application of a specific rule must be left to the broad discretion of the trial court. In *Shaw*, we said, "It is not practical to lay down a hard and fast rule governing all cases, in all their varying circumstances...." *Shaw*, 344 S.W.2d at 37. "Despite the general rule, the means of applying it in the handling of arguments cannot be made fixed and exact because the facts and circumstances of cases vary widely and the application must be somewhat flexible." *Misch v. C.B. Contracting Co.*, 394 S.W.2d 98, 102 (Mo.App.1965).

Despite the obvious broad discretion granted to the trial court, there will be circumstances when this discretion has been abused and the appellate court will step in and overturn the trial court's ruling. In certain litigation, the issues will fall naturally and accurately into certain categories. For example, the division between liability arguments and damage arguments in most civil litigation is fairly obvious; if there is no argument on damages in either the initial portion of plaintiff's closing argument or in

3. Our courts have sometimes referred to the matters that may be argued in the final portion of plaintiff's closing argument as "proper rebuttal," both when it is based upon what the defendant argued and when it is based upon what the plaintiff argued in the initial part of the closing argument. We have resisted using the term "rebuttal" to describe the latter because we think rebuttal is required to be in direct response to what the defendant argued. The additional matters, which the plaintiff may argue under the Missouri expanded rebuttal rule by reason of what the plaintiff argued in the initial part of the closing argument, are simply matters that are proper argument in the final portion of plaintiff's closing argument but are not actually rebuttal.

4. Where a true rebuttal rule is followed, what is proper rebuttal is dependent solely upon what the defendant argued in closing argument. Under such a rule, what the plaintiff argues in the initial portion of the closing argument, nevertheless, has a practical impact upon what will be proper rebuttal. For example, if the plaintiff makes a particularly good argument on damages in the initial portion of the closing argument, this will likely force the defendant to answer the damages argument in closing argument, which, in turn, will allow the plaintiff to argue damages on rebuttal. On the other hand, if the plaintiff does not argue damages or does not do so effectively, then the defendant may choose not to argue damages, which under a pure rebuttal rule would mean that the plaintiff would not be allowed to argue damages in the final portion of the closing argument.

the defendant's closing argument, allowing argument by plaintiff in the final portion of the closing argument over objection would likely be an abuse of discretion. This rule was not violated in this situation because plaintiff argued damages in the initial portion of his closing argument.

 However, a similar but more specific rule, which is not subject to the discretion of the trial court, has developed in the Missouri cases. In *Goldstein v. Fendelman,* 336 S.W.2d 661 (Mo.1960), the Court recognized a significant limitation upon counsel's right to ask for specific amounts of damage by stating:

> [W]hile we recognize that the trial court has considerable discretion in the matter of arguments of counsel, we consider it unfair and improper to permit plaintiff's counsel to do this [ask for specific amounts of damages] for the first time in his closing argument when defendant's counsel has made no argument as to amount.

*Id.* at 667. The Court in *Goldstein* determined no objection had been made on that ground. However, the Court removed from the trial court's discretion the issue of when asking for a specific amount of total damages will be proper in plaintiff's final portion of the closing argument, i.e., only when plaintiff has asked for a specific amount of total damages in the initial portion of closing argument or defendant has made a damage argument that justifies plaintiff asking for a specific amount of total damages may plaintiff argue a specific amount of total damages in the final portion of the closing argument. In the present case, defendant made no substantial argument with respect to damages and did not discuss specific amounts. The only specific amount of damages mentioned by the plaintiff in the initial portion of the opening argument was $54,419.28 for actual, out-of-pocket past expenses for medical and loss of wages.

It should be obvious from even the slightest consideration of the rationale for the rule that plaintiff's mention of actual damages of more than $54,000.00 in the initial portion of his argument does not lay the foundation for his specific request for over $3,000,000.00 total damages in the final portion of his argument. The opportunity for the defendant to answer the $54,000.00 argument as to special damages is certainly not an opportunity to answer the plaintiff's specific request in the final portion of his closing argument for a total verdict in excess of $3,000,000.00.

The Missouri court of appeals has had further occasion to consider under what circumstances a request for a specific amount of damages will be proper in the final portion of the plaintiff's closing argument. In *Hart v. Forbes,* 633 S.W.2d 90 (Mo.App.1982), the plaintiff, in the initial portion of the closing argument, discussed the difference between special and general damages and explained to the jury that his special damages totaled $3,229.50. *Id.* at 93. He discussed pain and suffering, anxiety caused by the accident, nightmares the plaintiff had, and a permanent leg injury caused by one leg being one-half inch longer than the other. *Id.* at 94. However, he did not ask for a specific amount of total damages for these injuries. In plaintiff's final argument, counsel began by saying, "[W]e're not going to ask you for any particular amount of money, ..." but then asked a rhetorical question: "Is sixty years worth sixty thousand dollars?" *Id.* The defendant's objection that this was improper rebuttal argument was sustained. *Id.* In affirming the trial court, the court of appeals, succinctly summarized and followed the rule from *Goldstein* as follows:

> From *Goldstein,* it is obvious that the matter of final argument is within the sound discretion of the trial judge, but there is a prohibition against plaintiff's counsel arguing a dollar amount in the final portion of closing argument (absent reference in the initial phase and/or comment relative thereto by defense counsel) on the basis of fairness to both parties.

*Hart,* 633 S.W.2d at 95.

In *Clark v. Kansas City Area Transp. Authority,* 673 S.W.2d 55 (Mo.App.1984), the defendant complained on appeal of

> the trial court's refusal to permit appellant to argue a dollar amount for damages when she had not argued such in the initial part of her closing argument [the defen-

dants did not comment on the dollar amount in their argument].

That plaintiff herein failed to request a specific sum or suggest a dollar amount in her initial closing argument is not in dispute. The defendant likewise did not comment on a dollar and cents figure. Plaintiff may not, therefore, in the final portion of closing argument inject an amount into the case when defense counsel made no argument as to amount. *Goldstein v. Fendelman,* 336 S.W.2d 661, 667 (Mo.1960); *Votrain v. Illinois,* 268 S.W.2d 838, 844 (Mo. banc 1954).

*Id.* at 59. The court of appeals also quoted from *Shaw,* 344 S.W.2d at 37, in holding that the trial court did not err in denying plaintiff's request to argue a specific amount of damages in the final portion of plaintiff's closing argument. *Id.*

In *Weinbauer,* 610 S.W.2d at 677–79, the court of appeals let the trial court's ruling stand, which allowed the plaintiff to ask for a specific amount of money in the rebuttal portion of his argument even though he did not ask for a specific amount of money in the initial portion of his closing argument, but, unlike the present case, the defendant argued damages in closing argument. *Weinbauer* cites and relies upon *Barrett,* 495 S.W.2d at 104–05, and *Midwest Library Service, Inc. v. Structural Systems, Inc.,* 566 S.W.2d 249, 251–52 (Mo.App.1978), where plaintiffs were allowed to mention a specific amount of damages in the final portion of their closing argument because the defendant had argued damages in closing argument. *Id.* at 678.

Not only is the rule set forth in *Goldstein* well supported in case precedents, but it is also supported by sound reasoning and understandable rationale. When one lawyer who is not present at a trial asks another lawyer who was present to describe the plaintiff's damage closing argument, it will almost always be described by relating what amount of damages the attorney asked for. If it is not described in this manner, the follow-up question will likely be, "How much damages did the plaintiff ask for?" This is because a plaintiff's damage argument is largely characterized by the decision of

whether to ask for a specific amount of damages and, if so, how much. These are not easy decisions. The plaintiff may ask for such an unreasonably large and unexpected amount of damages so as to turn the jury off. Or, the jury may feel that by suggesting a specific amount the plaintiff's counsel is infringing upon their function. If the plaintiff does suggest a specific amount of damages, the decision of how the defendant will respond can be difficult and very important. Should the defendant treat the plaintiff's demand as being so large as to be ridiculous, or should it be ignored? Should the defendant suggest an amount of his own, which in many instances will become a floor for the verdict, or should defendant argue the case as if it will be decided for defendant on liability and not discuss damages? All of these are difficult and critical decisions for both the plaintiff and the defendant, but they are decisions that each party should have an opportunity to make if, in fact, the damage argument progresses to the point of a discussion of specific amounts.

A decision to ask for a specific amount is an easily and accurately ascertainable occurrence in any trial. It consistently signals an intensifying of the damage argument. It generally presents the same type of problems in every lawsuit. It is an occasion in which fairness demands an opportunity for the defendant to respond and a circumstance to which the defendant cannot intelligently respond until he first hears the plaintiff's demand. Under these circumstances, it makes eminent sense to have a definite rule, as Missouri does, which is clear, concise and understandable. Missouri's rule has been set out with clarity for the past thirty-four years in *Goldstein.* The plaintiff in this case proceeded directly into the teeth of the rule over the specific objection of the defendant who was raising precisely the correct rule. Under these circumstances, we have no choice but to find that the trial court erred in allowing plaintiff to ask for a specific amount of total damages for the first time in the final portion of his closing argument.

**B.**

Having found error, we must determine whether the error was prejudicial. One line

of cases supports the proposition that argument on the issue of damages can be prejudicial only if there is an excessive verdict. *See, e.g., Smith v. Courter*, 531 S.W.2d 743, 748 (Mo. banc 1976); *McCormick v. Smith*, 459 S.W.2d 272, 278 (Mo.1970); *Chambers v. Kansas City*, 446 S.W.2d 833, 841 (Mo.1969); *Conlon v. Roeder*, 418 S.W.2d 152, 162 (Mo. 1967); *Faught v. Washam*, 329 S.W.2d 588, 602 (Mo.1959). *But cf. Sparks v. Auslander*, 353 Mo. 177, 182 S.W.2d 167, 173 (1944) (argument as to damages not prejudicial unless it had some *effect* on the amount of damages) (emphasis in original). On the other hand, in *Lester v. Sayles*, 850 S.W.2d 858 (Mo. banc 1993), this Court stated that the party responsible for error relating to argument on the issue of damages "should be charged with a presumption that the error was prejudicial". *Id.* at 864. The error in *Lester* occurred when the trial court complied with the jury's request during deliberations for a chart, which was not in evidence, showing the specific amounts of damages plaintiff's attorney had asked for in closing argument.

In *Shaw*, this Court dealt specifically with the issue of whether error that improperly deprives defendant of a damage rebuttal argument is only prejudicial if the damages are excessive. In rejecting this argument we said:

> The issue here is not merely whether the verdict was thus rendered excessive, as plaintiff now contends. No one can say what verdict this jury might have returned if the arguments had proceeded in the regular course, and if defendant's counsel had been permitted to answer the argument on injuries and damages. We hold that this error would necessitate a reversal, independent of other points raised.

*Shaw*, 344 S.W.2d at 37.

We believe the rule in *Lester* is the better rule. There is an enormous variance in the size of the verdict that a rational jury may return and still not be excessive, particularly in a personal injury action. All of the various factors that inure in a jury verdict potentially have an impact upon the amount of the verdict any given jury returns in a given case. These would include the evidence, the applicable law, and the argument on damages. Any error in any of these factors in a jury trial will be prejudicial to the defendant if it results in an increase in the amount of the verdict, even though such increased verdict may not be excessive. However, it is usually impossible to determine whether or how much such an error contributes to the verdict. Given the fact such errors have occurred, it is more reasonable to assume that they contributed to an increase in the damages than to assume the contrary. This, in part, is the rationale for the decision in *Lester*.

In reviewing verdicts to determine if they are excessive, appellate courts overturn only those verdicts that are obviously out of line and grossly improper. In *Breeding v. Dodson Trailer Repair*, 679 S.W.2d 281 (Mo. banc 1984), we said: "To obtain relief on the basis of excessive verdict, the defendants must demonstrate that the verdict is glaringly unwarranted so as to shock the conscience of the court." *Id.* at 286. The test applied by appellate courts is not fine tuned and should not be; the appellate courts generally defer to the jury's decision as to the amount of damages. This is as it should be because the determination of the amount of damages is a task that lay juries are particularly able to perform. As a result, it is fairly unusual for an appellate court to find a jury's determination to be excessive. This further strengthens the argument for finding prejudice even though there has been no finding of an excessive verdict. First, if we make enforcement of the rules concerning evidence and argument related to damages dependent upon the uncommon finding that the damages are excessive, we neutralize the impact of those rules in the majority of cases because we will only be enforcing the rules on the rare occasion where damages are found to be excessive. Second, if we are going to defer to the jury's determination of damages, we must be assured that the jury's finding was reached under a set of rules that guarantee fairness to all parties concerned under all circumstances. To argue that the verdict is not excessive because the rules were followed and that the rules do not have to be followed unless the verdict is excessive is to engage in

a circular argument. To avoid this pitfall we must enforce the rules if we are going to encourage appellate courts to defer to the jury's determination of damages. If we do not enforce the rules, then we cannot rely on the jury's damage assessment. Determination of damages is something that courts do not do well. This function is better performed by a jury, and courts should not second-guess a jury's determination when it can be avoided.

The rule in *Lester* is also in keeping with the common practice in other areas of the law. For example, error in "[t]he exclusion of evidence is presumed prejudicial unless otherwise shown." *McMillin v. McMillin*, 633 S.W.2d 223, 226 (Mo.App.1982). *See also Reed v. Reed*, 101 Mo.App. 176, 70 S.W. 505, 506 (1902) ("The error is presumed to be prejudicial where it is not shown to be harmless."). Though not always so clearly stated, this is the general rule when reviewing the admission or exclusion of evidence. *See e.g., State Farm Mut. Auto. Ins. Co. v. Allen*, 744 S.W.2d 782, 787 (Mo. banc 1988) (no prejudice in erroneous exclusion of testimony when later witness gave same testimony); *Hansome v. Northwestern Cooperage Co.*, 679 S.W.2d 273, 276 (Mo. banc 1984) (no reversible error in excluding cumulative evidence). In accordance with this rule, "[e]rror committed in a criminal case is presumed prejudicial, but that presumption is not conclusive and may be rebutted by the facts and circumstances of the case." *State v. Dale*, 874 S.W.2d 446, 452 (Mo.App.1994).

We adopt the rule derived from *Lester* that the party responsible for error relating to argument on the issue of damages is charged with a rebuttable presumption that the error was prejudicial. Cases holding that error in argument on the issue of damages is prejudicial only if there is an excessive verdict are overruled to the extent they are inconsistent with this opinion.

In the present case, we presume that the trial court's error was prejudicial. The plaintiff has not shown otherwise. In fact, the proximity of the jury's determination of damages to the specific amount plaintiff's counsel requested in the final portion of his closing argument supports the presumption of prejudice.

The jury's verdict of $2,850,000.00, even considering the plaintiff's serious injuries, is a very substantial verdict. Even in this day and age when million dollar verdicts are not uncommon, in the parlance of the ball diamond, this is a "big league" verdict. Certainly the size of this verdict forecloses us from avoiding a remand on the basis that the error was not prejudicial. The prejudicial effect may have been cured if defense counsel had been given an opportunity to reply to the increased specific amount, but we find no requirement that defendant's counsel request this uncommon remedy. *See, e.g., Sullivan v. Hanley*, 347 S.W.2d 710, 716 (Mo.App. 1961). Thus, the trial court committed prejudicial error in overruling the defendant's objection and allowing the plaintiff to ask for a specific amount of total damages for the first time in his final closing argument.

This error goes only to damages and does not affect liability. We reverse and remand for a new trial on damages only. "No new trial shall be ordered as to issues in which no error appears." *Rule 84.14.*

## V.

Synergy's final point is whether the trial court erred in not finding that the verdict was excessive and either (1) ordering a new trial because the verdict was the result of passion and prejudice arising from the admission of the testimony concerning the 1989 training session or Tune's final closing argument concerning damages, or (2) ordering a remittitur because the verdict exceeded fair and reasonable compensation for Tune's injuries. Because we reverse and remand for a new trial on damages, we need not address this issue.

## VI.

We reverse the judgment as to the damage award but affirm the judgment in all other respects. We remand to the trial court for a new trial on the issue of damages.

COVINGTON, C.J., and PRICE, LIMBAUGH and ROBERTSON, JJ., concur.

HOLSTEIN, J., concurs in part and dissents in part in separate opinion filed.

BENTON, J., concurs in opinion of HOLSTEIN, J.

HOLSTEIN, Judge, concurring in part and dissenting in part.

I respectfully dissent from part IV of the majority opinion and the reversal of the trial court's damage award. The majority overrules well reasoned and long-standing precedent vesting the trial court with broad discretion regarding the propriety of closing argument of counsel, excuses the appellant from seeking the most efficient remedy available, excuses the appellant from demonstrating genuine surprise resulting in an absence of opportunity to respond to an argument, and orders a new trial without properly determining whether the allegedly improper argument had a prejudicial effect. In straining to sustain its result, the majority misreads or misapplies the cases on which it relies.

I.

It was clear from the inception of this trial that the plaintiff's attorney intended to ask the jury to award his client a substantial amount of money as damages. Before the defendant was ever required to make its closing argument, the plaintiff twice told the jury that he was seeking large sums as compensation for his injuries; "seven figure" damages were mentioned in the *voir dire,* and the plaintiff testified from the witness stand that $6 million to $10 million would be inadequate compensation for the damages he had received.

In addition to the comment in *voir dire* and the testimony, the opening part of the plaintiff's closing argument cannot, in any way, be characterized as failing to argue, discuss or mention damages for pain and suffering. That argument included the following:

And then when you consider what Ron's damages are, you look at his present damages, and we've got the exhibits there. You can see how they are all figured. His medical bill, which I thought was very reasonable for what was really intensive care. His loss of earnings, $23,846. Those

little things of soaps and whatever, and we took them based on what he said, and computed it out, $3,481. Those present loss of earnings are $54,419—I mean present damages, $54,419.24.

And then we come down to the things that you have to consider for the rest of it, for the things we can't just look at a receipt. Pain and suffering, you have to put a figure down there. You have to figure out what it's worth. Loss or diminishment of quality of life. Remember the things he liked to do. The golfer can't golf anymore. I can't go sailing any more. The things that make life worth living that you can't do now. You put a figure in there. And that's present damage, present and tangible damages.

Then you've got to consider. Remember, we read—the Judge took judicial notice of the life tables? If, God willing, he lives an average life, he's going to live another 35.8 years. So if he has future medical expenses, if you find that he has some future medical expenses, you have to put a figure in there. If you find that he's got future loss of earnings because of his condition, you've got to put a figure in there. If you find he's going to have future pain and suffering because of his condition, you know, his sensitivity to cold, et cetera, you put a figure in there.

And, again, quality of life. He's an outside guy, he said. He likes to do things outside. For the next 38 years, his life has changed. He's a different person. He's lost something, and the law recognizes that, and you've got to put a figure in there. And then you total it all up, and that's what you award him.

Furthermore, the defendant's attorney in his closing argument went considerably further in discussing the plaintiff's injuries than is suggested by the majority opinion. The following excerpts are taken verbatim from the argument of defense counsel:

I, also, ladies and gentlemen, want to talk about these instructions to you a little bit. And we'll just start with this Number 5 [the verdict directing instruction].

. . . .

You cannot return a verdict unless you believe these propositions. And that's the propositions [sic] in this instruction right here, these five elements. Ladies and gentlemen, in order to find for Mr. Tune, in order to find in favor of Mr. Tune, you must find all five of these elements.

[Elements one through four are reviewed.]

. . . .

Fifth, "Plaintiff was damaged as a direct result of the propane being sold without adequate warning."

. . . .

Dr. Gaska [plaintiff's physician] testified, and he said, stated you could see the outline of the clothes right around where the burns—just right where there was no clothes. There weren't any burns sustained in the areas where there was clothes.

. . . .

You know, I'm sorry for Mr. Tune. I think every one of us feel sorry for Mr. Tune. I think every one of us feels sorry for anybody that's burned. I know I do. It's a shame. And I really feel sorry for him. But ladies and gentlemen, the oath that you took as jurors, regardless of sympathy, you would render a just and fair verdict.

. . . .

Ladies and gentlemen, it's sad that the injuries that Mr. Tune received are bad injuries, and I certainly would not want to downplay the types of injuries that he has had.

## II.

The broad general principle to which all other rules relating to closing argument are subordinate is that the trial court has wide discretion on rulings of the propriety and prejudicial effect of the argument of counsel, and appellate courts will defer to the trial court's ruling absent an abuse of discretion. *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.,* 700 S.W.2d 426, 434 (Mo. banc 1985); *Conlon v. Roeder,* 418 S.W.2d 152, 162 (Mo.1967); *Votrain v. Illinois Terminal Ry. Co.,* 268 S.W.2d 838, 844 (Mo. banc 1954).

Thus, the rule is well established that the standard of appellate review is that of abuse of trial court discretion. Because of that standard, only rarely have judgments been reversed due to improper argument. There is only one case of this Court cited by the majority, and research discloses no others, resulting in a reversal because of improper argument due to raising "new matters" as to amount of damages in the closing part of the plaintiff's argument.

In that case, *Shaw v. Terminal R.R. Assoc. of St. Louis,* 344 S.W.2d 32 (Mo.1961), there was **no mention** of injury or damages in the opening portion of the plaintiff's closing argument. Defense counsel, before plaintiff's counsel completed the opening portion of his argument, approached the bench and specifically demanded that plaintiff make all arguments in the opening part of summation and, if plaintiff failed to do so, defendant would object to any new matters of argument in the closing part of the plaintiff's argument. Defense counsel made *no mention* of injuries or damages during his argument that might be considered to have waived the point. *Shaw* is distinguishable from the case at hand. Here the damages, including damages for pain and suffering, were specifically mentioned in the opening part of the plaintiff's argument.

As correctly noted by the majority, *Shaw* stands for the proposition that in the second portion of closing argument, a plaintiff can argue *anything* that plaintiff argued in the initial part of closing argument and may rebut *anything* that the defendant argued in defendant's portion of the closing argument. Applying that principle here, plaintiff argued both special and general damages during the initial argument, specifically mentioning plaintiff's claim for pain and suffering. Defendant's argument made reference to damages in at least three different contexts. Thus, the *Shaw* rule was not violated.

Notwithstanding that, the majority has, for the first time, discovered a "similar but more specific rule" which it extracts from *Goldstein v. Fendelman,* 336 S.W.2d 661 (Mo. 1960); *Hart v. Forbes,* 633 S.W.2d 90 (Mo. App.1982); and *Clark v. Kansas City Area Transp. Auth.,* 673 S.W.2d 55 (Mo.App.1984).

Remarkably, none of those three cases claim to create any new or different rule than that stated in *Shaw*. Indeed, a careful reading of those cases demonstrates that they reflect nothing more than the general rule that appellate courts will not tinker with rulings regarding argument, absent an abuse of trial court discretion.

In the primary case relied on, *Goldstein v. Fendelman, supra*, the plaintiff had used a cardboard during closing argument on which he wrote fourteen items of damages totaling $77,735. The opinion fails to make clear what occurred, but it appears no mention was made regarding damages during the initial portion of plaintiff's argument. The Court concluded that no error occurred in plaintiff's counsel writing on the large cardboard his claims as to the worth of particular injuries, and arguing the amounts of those to the jury. The Court based its conclusion on the fact that the verdict was not excessive and the scope of defendant's objection only included complaints regarding the use of the cardboard. 336 S.W.2d at 667. In what was plainly dicta, the Court said,

> "[W]hile we recognize the trial court has considerable discretion in the matter of arguments of counsel, we consider it unfair and improper to permit plaintiff's counsel to *do this* for the first time in his closing argument, when defendant's counsel has made no argument as to amount." (Emphasis added).

*Id.* The majority here has supplemented the words "do this" with the words "asked for specific amounts of damages" in order to create its new rule. By adding the bracketed words, the majority suggests that in *Goldstein* there was some argument of damages but no mention of specific amounts in plaintiff's initial argument. One could as easily argue that "do this" means "mentions damages." In light of the fact that less than a year later, *Goldstein* was the primary authority relied on in *Shaw*, there is substantial reason to believe that "mentions damages" was what "do this" referred to in the *Goldstein* quote noted above.

In concluding that under the circumstances of the *Shaw* case there was error in allowing the argument, this Court went on to say, "It is not practicable to lay down a hard and fast rule governing all cases in all their varying circumstances; we do not attempt to do so." 344 S.W.2d at 37. Those same words have been echoed repeatedly in cases where a complaint is made of prejudicial error because the plaintiff went into new matters during the final portion of the closing argument. *Clark* at 59; *Samborski v. Price*, 417 S.W.2d 205, 209 (Mo.App.1967); *Sullivan v. Hanley*, 347 S.W.2d 710, 715 (Mo.App.1961). If *Goldstein* set down a similar but distinct rule, it was plainly overruled or, at least, consumed, by *Shaw*.

The majority's reliance on *Hart v. Forbes* and *Clark v. Kansas City Area Transp. Auth.* is similarly misplaced. In both cases, the appellate court **affirmed** the trial court's exercise of discretion in limiting argument. Neither of those cases purports to adopt a strict rule of error and presumption of prejudice, as is suggested by the majority. At most, their references to such a rule are merely **dicta** in support of the trial court's exercise of discretion in refusing to permit argument. In any event, a ruling of the court of appeals is subordinate to the most recent pronouncement of this Court in *Shaw*.

As noted by the majority, the reason that it is considered "unfair and improper to permit plaintiff's counsel to [mention new matters] for the first time in his closing argument" is that the defendant may be surprised by a demand to which he has no opportunity to respond. *Goldstein*, 336 S.W.2d at 667. A plaintiff should not be permitted to "conceal[ ] or withhold[ ] [his] position" so as to deceive or surprise the defendant. *Shaw*, 344 S.W.2d at 37. "It is generally improper for counsel having the burden of issues in a civil case to argue new matters or points in closing summation, after his opponent's argument, where such matter was not argued, discussed or mentioned in the opening summation." D.E. Evins, Annotation, *Propriety and Effect of Permitting Counsel Having Burden of Issues in Civil Case to Argue New Matters or Points in his Closing Summation*, 93 A.L.R.2d 273, 274, § 1[c] (1964). Nevertheless, the courts prior to today have consistently rejected the notion of a rule of absolute error. Under the traditional abuse

of discretion standard articulated in *Goldstein* and elsewhere, numerous circumstances have been recognized in which arguments of new matters in closing have been held not to result in reversal on appeal. 93 A.L.R.2d at 275, § 2.

Several factors play a role in determining whether the trial court has abused discretion in permitting an argument as to specific amounts of damages for the first time in closing or abused discretion in determining no prejudicial effect of such argument. No factor is absolutely controlling in determining whether there has been an abuse of discretion, but at least three considerations must be weighed. The first is whether, based on the entire record and the opening part of the argument of plaintiff, the plaintiff may be said to have "sandbagged" or surprised the defendant with the amount demanded in the closing argument. The second is whether the argument of new matters was waived by the defendant's conduct. The third consideration is whether the argument had the effect of producing an excessively large verdict.

These factors were well articulated by Judge Elmo Hunter sitting as a special judge on the Missouri Court of Appeals, Southern District:

> Each case must be determined upon its own peculiar facts. In the case before us although plaintiff's counsel in his opening argument did not mention personal injury, defendant's counsel in his closing argument did make the mentioned remark about the plaintiff's doctor's testimony concerning the number of times he saw plaintiff. Certainly in his closing argument plaintiff was entitled to go into that subject. Thus, the objection upon which the court was called to pass was too broad in endeavoring to exclude any argument about any injuries. Nor was there any notice to plaintiff's counsel at the close of the opening argument that defendant's counsel was insisting upon literal compliance with what until the Shaw case had been more a custom policed by the trial judge than a strict rule with appellate court reversal the penalty.
>
> There are some additional considerations which although not in and of themselves controlling are noteworthy. As we read the record defendant was reasonably well-informed as to plaintiff's medical contentions by the very evidence that plaintiff had offered. Defendant did not ask for any opportunity to reply to the newly mentioned items of the closing argument of plaintiff's counsel. *See 88 C.J.S. Trial § 169, p. 339, n. 63.* We are unconvinced that defendant was surprised or "sandbagged" by the very general and brief remarks touching on damages and personal injury which we have set out in full. And, as mentioned there is no complaint made on this appeal that the sum awarded as damages for the personal injuries suffered was excessive.

*Sullivan,* 347 S.W.2d at 716.

### III.

Applying the above principles here, I am persuaded, first of all, that the defendant cannot claim surprise or deception by the mention of $3,368,825 for the "first time" in the last part of the plaintiff's argument. Plaintiff's counsel had indicated he was seeking a "seven figure" verdict during *voir dire.* The plaintiff testified that $6 million to $10 million would be inadequate to compensate him for his damages. In addition, although plaintiff's counsel never requested a specific amount of damages for pain and suffering in the initial part of his closing, he strongly emphasized that the jury would have to arrive at figures for future medical expenses, future lost earnings, and pain and suffering, and would have to total these amounts. The discussion involving pain and suffering was lengthy and detailed. Specific amounts for economic loss were argued. The arguments did not occur in a vacuum. The jury was well aware of the size of the verdict sought by the plaintiff. Indeed, plaintiff's counsel's request for only $3,368,825 is far less than the demand stated by the plaintiff in his testimony. The majority may well be correct that the defendant made a calculated tactical decision not to argue a specific amount of damages. But that decision was not the product of sandbagging, deception or surprise engineered by the plaintiff.

## IV.

Another factor which weighs against a finding of an abuse of discretion is the question of whether any complaint about the mention of a specific amount in the closing part of argument was waived by the defendant. One might read the majority opinion to say that a waiver only occurs by failing to timely and properly object or by the defendant arguing a specific amount of damages. That is not borne out by the cases. Other considerations impact on an assessment of the waiver factor.

Failure to give "notice and demand" for full argument is indicative of waiver. *See Shaw, supra.* Here defendant gave no "notice and demand" that plaintiff make argument for a specific amount of damages before plaintiff concluded the opening portion of his argument.

Second, as noted by Judge Hunter in *Sullivan,* failure to ask for an opportunity to reply to the figures mentioned in the final part of plaintiff's closing argument is a consideration in determining the "waiver" factor. The appellant here is asking for a new trial on the issue of damages when any harm could have been cured with a few minutes of reply argument. The trial court's broad discretion to control arguments of counsel clearly includes the discretion to allow such additional argument. Missouri and other states' cases have recognized the availability of the remedy of reply argument where new matters are argued in plaintiff's closing. *State v. Hale,* 371 S.W.2d 249, 256 (Mo.1963); *Sullivan,* 347 S.W.2d at 716; *Wallis v. State,* 546 S.W.2d 244, 247 (Tenn.Crim.App.1976); *Fort Worth Nat. Bank of Fort Worth v. Jones,* 403 S.W.2d 861, 862 (Tex.App.1966); *Pettibone v. State,* 160 So.2d 126, 129 (Fla.App.1963); and *Reddell v. Norton,* 225 Ark. 643, 285 S.W.2d 328, 332 (1955). Of these cases, *Reddell* held that such request was **required** before a claim of reversible error could be made. 225 Ark. 643, 285 S.W.2d at 332. Here, the majority finds it preferable to impanel a new jury and go through the entire process of a trial to correct a perceived harm which could have been corrected with a request for a few minutes of reply argument at the original trial. It is only sensible and efficient to

require appellant to seek and be denied the opportunity to respond before being entitled to the drastic remedy of a new trial. Failure to seek the least drastic remedy weighs heavily in favor of finding that the complaint was waived. At a minimum, such failure should be considered in determining whether an appellate court should find an abuse of discretion.

A third consideration in determining the waiver factor is whether the defendant's argument mentions the damages issue. Here that occurred not once, as suggested by the majority, but on at least three occasions: first by making specific reference to that paragraph of the verdict directing instruction requiring a finding of damages; second, in referring to the testimony of Dr. Gaska in an attempt to minimize the extent of the burn injuries that would have occurred if plaintiff had been properly dressed; third, when defendant acknowledged the seriousness of plaintiff's injuries in an unvarnished effort by defense counsel to present himself and his client as sympathetic and compassionate.

These were substantial references to the injuries and damages of plaintiff. Together the references support a conclusion that defendant waived any complaint about more detailed discussion of the injuries and damages in the closing part of the plaintiff's arguments. Defense arguments here were much more detailed than those found in *Bassett Furniture Indus. v. McReynolds,* 216 Va. 897, 224 S.E.2d 323, 330 (1976), where the defendant was held to have sufficiently raised the issue of damages in his argument to permit the plaintiff to respond in closing argument on damages and injuries when the defendant alluded to the plaintiff "as a man who is in serious circumstances," and to the fact that the plaintiff "has had his spinal cord injured." In Missouri, the fact that a defense counsel makes arguments to the jury on any aspect of the issue of damages has been held to permit the plaintiff to discuss specific amounts of damages for the first time in the closing portion of the argument. *Midwest Library Serv. v. Structural Systems,* 566 S.W.2d 249, 252 (Mo.App.1978); *Barrett v. Morris,* 495 S.W.2d 100, 105 (Mo. App.1973).

Among the factors to be considered in determining waiver include the defendant's failure to seek the least drastic relief, the discussion of issues relating to injuries and damages during the defendant's closing argument, and the defendant's failure to make demand and give notice as was done in *Shaw*. Again, while not controlling, these are all considerations in determining whether there was a waiver of the complaint and, consequently, whether an abuse of discretion occurred.

## V.

Even assuming the argument in this case was improper, an additional matter to be determined by the appellate court in every case where reversal is sought based on closing argument is whether the trial court abused discretion in making a determination of an absence of prejudice. Until today, a significant, if not controlling, factor in determining whether to reverse on appeal is whether the verdict is excessive. *McCormick v. Smith*, 459 S.W.2d 272, 278 (Mo. 1970); *Faught v. Washam*, 329 S.W.2d 588, 602 (Mo.1959). The excessiveness of the verdict is mentioned repeatedly in the cases on the subject, *Conlon v. Roeder*, 418 S.W.2d 152, 162 (Mo.1967); *Votrain v. Illinois Terminal Ry. Co.*, 268 S.W.2d 838, 846–47 (Mo. banc 1954); and *Sullivan*, 347 S.W.2d at 716. Indeed, the primary authority relied on by the majority, *Goldstein*, plainly declined to reverse the judgment not only because of the absence of a proper objection but because this Court specifically "found the verdict[ ] not [to be] excessive." 336 S.W.2d at 667. The term "excessive," in the context of the above cases, does not mean that the amount of the verdict is unconscionable or "exceeds fair and reasonable compensation." *See* § 537.068, RSMo Supp.1993. The size of the verdict alone is wholly unworkable as a basis for determining excessiveness. Rather, "excessive" means the improper argument relating to damages had a significant **effect** on the amount of damages found. *Sparks v. Auslander*, 353 Mo. 177, 182 S.W.2d 167, 173 (1944).

The majority rejects any claim to be relying on the notion of excessiveness in determining whether there was prejudicial error. Surprisingly, the majority goes back to the point by noting that this was a "very substantial . . . big league" verdict. If, as the majority argues, size of verdict is irrelevant in determining prejudice, lawyers and judges are left to wonder what purpose is served by referring to this as a "big league" verdict and to wonder how to distinguish between "big league" and "little league" verdicts. I confess I would be more comfortable with a conclusion by the majority that *Goldstein, Shaw* and their progeny establish excessiveness as a significant factor, and it is upon that factor that this decision turns.

The majority has also overlooked the impact of the Missouri Approved Instructions in determining the prejudicial effect of the argument. Most of the earlier cases cited and relied on here were decided prior to the adoption of MAI. Under MAI, every jury in a civil case in Missouri takes with them to the jury room MAI 2.01. In relevant part it instructs the jury, "At the close of the evidence, the lawyers may make arguments on behalf of their clients. Neither what is said in opening statement or in closing argument is to be considered as proof of a fact. However, if a lawyer admits some fact on behalf of his client, the other party is relieved of the responsibility of proving that fact." In this case, there was direct testimony by the plaintiff that $6 million to $10 million would be inadequate compensation. In closing argument, defense counsel came dangerously close, if he did not cross the line, to admitting the reasonableness of Mr. Tune's assessment of damages when counsel stated, "The injuries that Mr. Tune received are bad injuries, and I certainly would not want to downplay the type of injuries he has had."

The effect of MAI 2.01 is to put the jurors on notice that their duty under the law is not defined by argument of counsel except to the extent the counsel admits a fact in evidence. Even when no admission is made, the purpose of the instruction is to communicate to jurors that argument is not evidence and it is not law; the instruction is a polite way of telling the jury that argument is "baloney." I am unwilling to assume that the jury disregards that instruction and is swept away by

lawyer rhetoric. The instruction undergirds the general rule that verdicts should not be set aside on appeal for erroneous argument absent a clear abuse of discretion by the trial judge. *McCormick v. Smith*, 459 S.W.2d at 277. The trial judge, who not only hears the testimony and argument but sees the witnesses, lawyers and jurors, is in a far superior position to judge the propriety and prejudicial effect of any argument.

The majority cites *Lester v. Sayles*, 850 S.W.2d 858 (Mo. banc 1993), for the proposition that "the party responsible for error relating to **argument**," is charged with demonstrating an absence of prejudice. *Id.* at 864 (emphasis added). In point of fact, *Lester* did not involve any alleged error in the argument. The argument in *Lester* was quite proper in all respects. The issue there had only to do with the management of the jury during deliberations and what it was allowed access to. It requires substantial restructuring, stretching and analogizing of the *Lester* holding to say that it overruled a vast body of caselaw establishing abuse of discretion as the standard of appellate review in cases where a claim of error in argument is raised.

Finally, it is hardly "circular argument" to require that an error must be prejudicial before appellate courts should reverse. Neither is it circular to require at least some indication that the improper conduct had some prejudicial effect before concluding that the trial court abused discretion. If the majority desires to overrule the fundamental standard of abuse of discretion by which all appellate courts, prior to this date, have reviewed claims of erroneous argument, it should simply do so directly.

## VI.

The majority has chosen to change the rules rather than decide this case on the factual nuances that might demonstrate an abuse of discretion. The majority adopts a new, rigid and technical rule requiring that absent mention of a dollar amount for a distinct type of damages in opening summation, the mention of an amount for that element may not be made in the closing portion of the argument, no matter how detailed the opening part of the argument was regarding that element or that a demand for a far larger amount was before the jury. This new rule is an exception to the more general rule of trial court discretion regarding argument, and the new rule is itself riddled with exceptions.

I am unable to distill such a precise rule from the cases. All the cases relied on are distinguishable in one or more ways from this one. As convenient as a hard and fast rule of error regarding closing argument accompanied by presumption of prejudice may seem in the abstract, such rules often prove to be impractical and unjust when applied to specific cases. At best, this case is one in which reasonable persons could reach opposite conclusions as to whether the argument was improper or had a prejudicial effect. Such decisions are best left to a case by case analysis.

For all the above reasons, I believe the trial court did not abuse its discretion in controlling argument or in determining the prejudicial effect of that argument. I would affirm the judgment.